Murray *v.* Galbraith.

Opinion delivered April 13, 1908.

Libel—republication—separate action.—A separate action will not lie on a republication by the same party of a libel where the republication was made prior to the action on the original article.

Appeal from Jefferson Circuit Court; *Antonio B. Grace,* judge; reversed.

R. M. Galbraith brought an action of libel against Arthur Murray, alleging two causes of action, in separate paragraphs.

The first paragraph alleged that Murray was editor and proprietor of *The Press-Eagle,* a weekly newspaper published in Pine Bluff having a general circulation; that plaintiff and one J. B. York and C. Voss were commissioners of Graveling District No. 1, for paving Fifth Avenue in Pine Bluff, and were handling the funds of the district; that on June 19, 1906, defendant published in his paper the following article:

"There can no longer be any doubt of the fact that there is 'something rotten in Demmark' so far as the affairs of Graveling District No. 1 are concerned. Despite the tenderfootedness of two members of the committee appointed by the interested and defrauded property owners to make an investigation, facts have developed that clearly prove that the commissioners have charged their neighbors and fellow property owners of Fifth Avenue $10,477.85 for gravel for which they paid the St. Louis Southwestern Railway Company only $3,431.80, leaving a 'net profit' in this transaction alone of over $7,000. If the commissioners profited in this transaction, it is not unreasonable to suppose that they profited in the employment of labor and other items of expense necessary to the completion of this graveling district, which is conceded to be the most wretched botch of street paving ever perpetrated in this or any other community.

"*The Press-Eagle* is not addicted to publishing facts and figures involving the character of public or private citizens without being thoroughly advised as to the authenticity of these facts and figures. Therefore, when we stated last week that an apparent 'overcharge' of $7,000 had been made for gravel by the Commissioners of Graveling District No. 1, we were very careful to be within the bounds of truth, and to express the matter in language as mild as possible, so as to avoid giving offense or doing injustice to those responsible for the shortage, pending a thorough investigation by those most interested.

"This investigation has now been made so far as it is possible for the committee to proceed, and the facts in every way confirm the statement first made in this paper last week that the

commissioners had overcharged the district for about $7,000 for gravel alone. The cost of excavating, hauling dirt, curbing, etc., has not as yet been investigated, nor are we advised that it will be. But, if the investigation should be made, we should not be surprised if 'overcharges' were found in these items, as well as that disclosed by the investigation as to the cost of the gravel.

"There are three men who, by virtue of the trust imposed in them by their fellow-citizens, should be able to explain why their records show that this overcharge of over $7,000 was made in the purchase of gravel from the St. Louis Southwestern Railway Company. These men are J. B. York, president, Carl Voss, secretary and R. M. Galbraith, treasurer, of Graveling District No. 1. The two first named have been before the committee and interested property owners, and admitted their inability to explain the manifest overcharge. This leaves the burden of the explanation upon R. M. Galbraith, treasurer, who has been at Jacksonville, Ill., attending the funeral of a friend, for the past week or ten days.

"Meantime, another meeting of the property owners of Graveling District No. 1 has been called at the Board of Trade for Thursday night of this week. By that time, it is hoped that the obsequies at Jacksonville, Ill., will have been concluded, so as to enable treasurer Galbraith to return to the city and produce his vouchers and checks for $7,000, good and lawful money of the realm, that both his records and those of Secretary Voss show was paid to the St. Louis Southwestern Railway Company, and which the officers of that corporation assert over their official signature never came into their possession.

"In the classic language of the far-famed Sir Lucius O'Trigger, ''Tis a pretty quarrel as it stands.' "

That on the same date, these paragraphs appeared in the said Press-Eagle:

"Graveling District No. 1 is not the only paving district formed in Pine Bluff that was boodled. There are others."

"Still we see no very good reason why the check book can not be produced, even if the vouchers are missing."

Plaintiff alleged that by the above publication defendant sought to charge the plaintiff with the crime of embezzling the funds of the district, or fraudulently converting the funds of the

district to his own use, and defrauding said district of said funds, thereby seeking and intending to falsely impeach the honesty, integrity, veracity, and reputation of this plaintiff, and thereby exposing him to public hatred, contempt and ridicule.

The second paragraph contains the same general allegations as the first, and is based upon the following publication under date of June 26, 1906, therein set out:

"The damage suit filed against the editor of *The Press-Eagle* yesterday by two of the Commissioners of Graveling District No. 1 is not conclusive of anything except a determination on the part of the commissioners to shift responsibility for their own derelictions upon the shoulders of other and innocent parties. The imperfect and incomplete records kept by the commisioners show that the gravel of the district purchased from the St. Louis Southwestern Railway Company cost $10,447.85, while the records of the general auditor of the railway company and of the city clerk of Pine Bluff show that the gravel purchased cost only $3,434.80. Here is a manifest 'overcharge' of exceeding $7,000, of which treasurer Galbraith of the commission, after a two weeks investigation, traced $5,685.56 into the hands of local agent, J. W. Farley, of the Cotton Belt. This money is now said to have been remitted to the treasurer's office in St. Louis as receipts for freight, of which no itemized account was kept, which explains why the auditor had no record of it, so it is said. But the incontrovertible fact remains that, while the commissioners of Graveling District No. 1 purchased 500 car loads of gravel at $1.35 per yard, some six years later, the property owners of West Fifth Avenue, who desired the graveling district extended, purchased 100 car loads from the same railway company at about thirty per yard. This $1.05 excess per yard, which the property owners of Fifth Avenue of Graveling District No. 1 were required to pay on 500 car loads of gravel, totals the $7,000 overcharge of which they now complain, and which has not been explained to their satisfaction, although a majority of them, we are informed, have agreed to continue paying their tax assessments.

"*The Press-Eagle's* information concerning this graveling district imbroglio was obtained from the chairman and secretary of the committee of property owners appointed to get at

the facts, and their information came direct from official sources, as shown in the statements of auditor S. J. Johnson and city clerk W. A. Lee, published last week. If the comments made upon the official statements were libelous, then the statements themselves were libelous, and we do not consider this paper or its editor in any way responsible 'for the peculiar condition of affairs revealed by these official statements.

"That there was an overcharge of something like $7,000 for the gravel used on Graveling District No. 1, when compared with the charge for gravel used in extending that district, the records clearly show; and if the publication of this record, without attempting to prove who profited by this overcharge, is libelous and malicious, then we may plead guilty to the suit filed against us by Commissioners Galbraith and York, and settle their little damage bill, when properly discounted or rebated. Otherwise we consider ourselves from Joplin, Mo., and will have to be *cited* before we come across with that $75,000 to assuage the lacerated feelings of our friends, the Commissioners of Graveling District No. 1."

Plaintiff avers that by means of the publications he was injured in his reputation, good name and credit, and suffered mental shame and anguish in the sum of $37,500, and prays for judgment. An amendment to the complaint was filed asking for $27,500 as compensatory, and $10,000 as punitive damages.

Prior to the foregoing complaint and amendment, there had been first filed a joint suit for damages by this plaintiff and J. B. York for the alleged libel, which was afterwards dismissed. It was *The Press-Eagle's* comments upon this suit upon which was based the second count in plaintiff's complaint.

The answer denied malice and alleged good faith in the publications.

Trial was had, and verdict for plaintiff in the sum of $10,000 as compensatory damages. Defendant appealed.

*W. F. Coleman,* for appellant.

1. The court erred in giving a peremptory instruction. It is only where the alleged defamatory matter is unambiguous as to who was meant and what was meant that the court is authorized to take it from the jury. The court may decide whether the publication is susceptible of the meaning ascribed to it by

the complainant, but it is for the jury to say whether such mean-
ing is truly ascribed.   Newell on Slander & Libel (2 Ed.), 290,
305; 81 Ark. 363; 13 Am. & Eng. Enc. of Law (1 Ed.), 381,
382, 383; *Id.* 353; *Id.* 391; 393 note 3; 23 Ind. 265; 97 Mass. 1.
The instruction took from the jury consideration of the question
of qualified privilege.   Cooley's Const. Lim. (6 Ed.), 558-9.

2.   The court's instruction is misleading and argumentative,
and therefore prejudicial.   11 Am. & Eng. Enc. of Law, 256,
and notes 2 and 3.

3.   In an action for libel it is proper to submit for the jury's
consideration in mitigation of damages any evidence showing
that defendant did not originate the defamatory charge, that it
was a matter of common rumor at and before the time of pub-
lication, and that at the time of the publication he had good
cause to believe and did believe the same was true.   Also that
the conduct of the plaintiff was such as to cause the defendant
as a reasonable man to believe that the criticisms and comments
complained of were fair.   72 Ark. 426; 13 Am. & Eng. Enc. of
Law, 445; *Id.* 440, and note 6; *Id.* 442; Newell on Slander &
Libel (2 Ed.), 884, § 18; *Id.* 883.

*N. T. White* and *Benjamin J. Altheimer,* for appellee.

1.   Whether words are actionable *per se* is a question of
law for the court.   In this case there was no ambiguity in the
articles complained of; either there was or was not a libel com-
mitted.   If the jury could have found that appellee was not
meant by the charges, then it would have been a question of fact
for the jury; but where the language admitted of no other con-
struction than that put upon it by the court, it became a question
of law.   55 Ark. 501; 72 Ark. 422; 57 C. C. A. 49; 18 Am. &
Eng. Enc. of Law (2 Ed.), 909 *et seq.; Id.* 912; *Id.* 950.

2.   Where qualified privilege is pleaded, it is the duty of the
court to declare as a matter of law whether or not the article
was privileged.   18 Am. & Eng. Enc. of Law (2 Ed.), 1050;
Newell on Slander & Libel (2 Ed.), 391, § 9; *Id.* 392, § 11; *Id.*
552, 568; 65 L. R. A. 984.   Such being the case, there was no
error in declaring the matter libelous and not privileged.   50
Ohio, 201; 106 Mo. 94; 66 Mich. 307; 2 Overt. (Tenn.), 99;
13 W. Va. 183; 81 N. Y. 126; 81 Ill. 77; 60 Md. 158; 21 Fla.

431; 50 Ohio St. 71; 99 Cal. 431; 49 N. J. 579; 57 Wis. 570; 154 Mass. 238; 24 Ore. 431; 65 L. R. A. 992.

3. Good faith, lack of malice or probable cause can not be interposed in mitigation of the *compensatory* damages one has suffered by reason of a libel; and in this case no special damages were sought, and no punitive damages allowed. 55 Ark. 501; 56 Ark. 103; 57 C. C. A. 45, 48; 36 C. C. A. 475; 47 C. C. A. 384; 71 C. C. A. 309; 81 N. Y. 126.

HILL, C. J. Murray was editor and proprietor of *The Pine Bluff Press Eagle,* a weekly newspaper published in Pine Bluff. Galbraith was one of the commissioners of Graveling District No. 1 of the city of Pine Bluff. Murray published in his newspaper articles in regard to affairs of the graveling district which caused this suit for libel to be brought by Galbraith against him. The complaint is in two counts. The first count is based upon an article published on the 19th of June, 1906. It is not necessary to discuss the first article, as it is clearly libelous *per se,* and not privileged.

The second count is based upon an article published on the 26th of June, after Galbraith and one other commissioner had brought a joint libel suit, which was subsequently dismissed. This suit was brought by the appellee upon the two publications. This publication will be set out in the Reporter's statement of the case. Among other instructions, the court gave the following: "That the articles published by the defendant and set out in the complaint are libelous *per se,* that they were not privileged, and that plaintiff is entitled to recover."

The facts in evidence are not sufficient to make this a privileged publication, and if the article in the second count was libelous *per se,* and made a distinct and separate cause of action, then his instruction was correct; otherwise, it is error.

An examination of the article set out in the second count, when disconnected from the previous publication, renders it difficult to determine exactly what charge is brought against Mr. Galbraith. Taken in connection with the previous article, it is in a sense a repetition of the libel, and in another sense an explanation and justification of why the first article was published, rather than a charge of actual wrong-doing or dishonesty. The law seems settled that a repetition of an identical libel is

not a new cause of action, but an aggravation of the pre-existing cause, and is always competent evidence tending to prove malice. The Supreme Court of New York said: "When a libelous article is republished before the commencement of an action, a separate action can not be maintained on such publication. The repetition of the publication may be pleaded and shown on the trial and bearing up the malice of the defendant and the extent of the injury and damage to the plaintiff." *Galligan* v. *Sun Ptg. & Pub. Co.,* 54 N. Y. Supp. 471.

The Court of Appeals of New York approved the following opinion of the Supreme Court of that State: "But the authorities are uniform that words proved as repetitions of the slander charged are not an independent ground of action in the case, and that no recovery can be had for uttering them. They reflect upon and strengthen the claim for damages on account of the words charged." *Enos* v. *Enos,* 135 N. Y. 609.

"Nor will a separate action lie on a republication by the same party of a libel, where the republication was made prior to the action on the original article." 25 Cyc. 431.

For the admissibility of such repeated libels, see a good discussion on the subject in *Gribble* v. *Pioneer Press Co.,* 25 N. W. 710.

Both the article in the first count and the article in the second count were printed before the bringing of this suit; and the utmost that can be said of the article in the second count is that it repeated the libel contained in the first. It is doubtful that it amounts to libel *per se.* Even if it does, however, under the principles above announced, it would not be an independent cause of action. If not libelous *per se,* of course the instruction is erroneous. Under either view, the judgment rendered under this instruction can not be sustained. It is clearly admissible as evidence showing the animus of the prior publication, but can not be sustained as an independent cause of action and libelous *per se.* The court so treated it, and therefore it erred. This error makes it necessary that the judgment be reversed, and renders it unnecessary to consider the other matters presented.

·The cause is reversed and remanded.